We are ready to proceed. I'd like to welcome Judge Alvin Hellerstein of the Southern District of New York, sitting with us today. We're delighted to have him. First case then, Kimball v. Village of Painted Post. May it please the court. Everyone in this room probably knows someone who's been sexually harassed or discriminated against on the basis of their gender. Many of us know someone who'd been retaliated against, who was retaliated against for speaking out about it. Ms. Kimball is one of those people. The district court below erred when they found that the plaintiff failed to make out a case of discrimination, that her claims were time-barred, and that the human rights law did not allow the continuation of those claims. They were not told during the time that they were pending before the EEOC. We believe that the court erred both in that determination and in the determination that the plaintiff had not made out a cause of action for a hostile work environment or discrimination on the basis of her gender. She was paid differently. She was paid less than the new hires. I think it was deemed . . . As to payment, she executed a general release as to her payment claims. Isn't that correct? That general release was rescinded by her attorney in writing. But she didn't tender back the money she had accepted in payment for release. Is that correct? She did not tender. It was not asked for. It was not raised as an affirmative defense in the answer. Our position is that it's waived. If the defendants had demanded it at any time, certainly she would have provided it back to them. Why do you have to tender it? I mean, why do you have to ask for it? She's the one who's saying she rescinded the release. You don't get to rescind a release for which there was consideration paid unilaterally. I believe that the ratification doctrine provides for consideration of a number of factors, including whether or not she was in her straight form of mind because she had just gotten out of the hospital. I believe that the consideration that was given is also . . . And what is the record exactly as to when she got out of the hospital vis-à-vis when the release was signed? She indicates in her testimony it was right after. Right after is not what I asked. The same day. Immediately the same day went from the hospital to the session where she signed the release. Is that correct? The day that she was released. That's correct. That is her testimony, and that is her recollection. Now, you notice that the release has two different dates on it. The notary is a different date than the alleged signature. In any event, the $1,230 that they tried to pay her for the loss or the difference in pay did not address the pay disparity as a result of discrimination on the basis of gender. Additionally, when the . . . I'm having trouble. I want to understand what the claims actually are here. There are both claims of disparate treatment in specific adverse employment actions and a claim of hostile work environment. Is that correct? Correct. And the claims of disparate treatment, what exactly are the adverse employment actions? The pay is one of them? Pay is one of them. She didn't have a sign on her locker. She wasn't fitted for a vest. I believe that if you take a look at the . . . How many of these . . . now, those . . . how many of those adverse employment actions are within the limitations, statute of limitations period? Well, the reprimands occurred both in 07 and 08. So the reprimands about her leaving a knife or a pen in the car and having to write the memo in response, having to write a memo in response to her . . . I just need a list. I'm not asking to have you argue each of them. I just would like to know which are the adverse employment actions that occurred within the limitations period. I understand that the hostile environment claim, to the extent that there is some act in furtherance of the hostile environment, even one within the limitations period would mean that it's a timely claim for the entire hostile work environment claim. But with respect to specific adverse employment actions, could you just list for me the ones that occurred within the limitations period?  The reprimands was the first, you said. The reprimands, not being fitted for a vest. They changed her pay from . . . they reduced her pay in June of 08. The second pay, the pay issue that postdates the release. Yes. And additionally, the writing of the memo for going to the DA about the pornography we would suggest is an adverse action within the universe of discriminatory conduct as well as hostile work environment. Requiring her to write a memorandum explaining why she complained to the lawyer rather than to her chief, that was an adverse employment action? Why she went to the district attorney, yes. Making her write that memo. Why is that an adverse employment action? How does that affect the terms and conditions of her employment? Well, it's adverse because it's retaliatory. And retaliation . . . No, no, these are separate. The motive is retaliation. The issue is, is this something that is harmful enough to . . . for purposes of disparate treatment. We're trying to disaggregate all the claims here so we understand what you're actually complaining about. So, the . . . for purposes of discriminatory treatment, it has to have a significant impact on her employment conditions. And the pornography has an adverse action on her work conditions. As a woman, it is discriminatory to be looking at porn on the work site where she is present. We would allege that that is an adverse action to a woman on the job watching porn. I understood the pornography allegations to be more limited than you have just made out. I understood that when the chief was Mr. Yost, that there was visible pornography at some point. This was before . . . in 2007. And that thereafter when the new chief came on, there were two instances in which your client had viewed a minimized version . . . a name that suggested that someone else might have been using a work computer to look at pornography. And, she complained and the department issued a memoranda reminding staff. There was one instance in 2007, one in 2008. I saw her deposition testimony saying that she had observed something many times. I thought it was the minimized version, which this is not to suggest that having any pornography viewed in the workplace . . . particularly at a police department, perhaps, is acceptable. But, the allegations were remarkably vague, it seemed to me, as to place and exactly what was viewed. Could you help me flesh that out, please? Again, within the time period we're talking about, because I tend to see the time in which the chief was Mr. Yost . . . as a separate phase, possibly from after Mr. Yost's departure. So, perhaps you could answer all of those questions. I'll try, Your Honor. The EBT of Chief Helm at the record page 1285, A1285. He was shown the exhibit of the teensexmovies.com. The date on . . . This was a screenshot? Yes. Yes. Dated May 26th of 2008. And, you said EBT. What is EBT? Examination Before Trial, his testimony, his deposition testimony at A1285, those screenshots. So, she had copies of them from May of 2008. When did she . . . I saw that one reference to a screenshot. When was that screenshot taken? May 26th, 2008. Uh-huh. So, that's one instance. I think there were . . . What is the screenshot of? Is there actual pornography, or is there something like a Google fill-in, that when you start to type Portugal, it shows up porn? Or something that says what the search history is. Are we talking about actual pornographic images visible to the plaintiff, or something else? Yes. It would pop up . . . Wait, wait. That's an either or. It's not a yes. Are we talking about actual pornographic images, and there's a screenshot of that? Is that what you're telling me? There's a screenshot of the website address. It would pop up . . . Of the website. That's what I ask. Is it about images of pornography, or is it the titles of websites that someone had apparently visited on that computer? My recollection in the record, Your Honor, is that there are both. There are depictions of women . . . When you say there are both, there are screenshots of pornographic images that were viewed by the plaintiff that are shown to Chief Holm? Is that what you're saying? Correct. We showed them to him at his deposition at page 1285. Yeah, but at page 1285, there's . . . The screenshots that are contained within Exhibit RH-5 show website addresses. Is that correct? Correct. Yes. That doesn't say anything about images of pornography. The images are . . . That's a screen site address. I'm sorry, Your Honor. That says a screen site address is what the image is of. Yes. Teen, sex, movies. Yes. And the images that my client was able to take screenshots of and preserve are contained in the record. She indeed viewed . . . And what I'm asking is, are any of those screenshots actual images of pornography, and where will we find evidence of that in this record? Well, I'll have to look at the record to look at the particular pages. But my recollection was that those were part of the exhibit that was included with the opposition to the summary judgment motion, and that those were provided to the court. And I understand that you're trying to make a distinction between whether or not she actually saw like a movie . . . Well, you said she observed pornography, that she was forced to watch pornography. Oh, that was with Mr. Yost. Excuse me. Those were the words you used here. And I'm simply trying to establish whether there is evidence of that in the record, because I hadn't seen it. That's what I'm asking you about. Okay. I believe that it's also in her testimony, at her deposition, that she testifies that Helm had shown . . . I'm sorry, that Yost had shown her pornographic movies, as well as others in the department, and that the screenshots are contained within an exhibit. And I'll be happy to collect them and brief it for the court following. Yost was terminated. Pardon me? Yost had been terminated. No, he wasn't terminated. He was actually retired and then hired as a consultant, without the consent or knowledge of my client, until he started stalking her and following her again. So, he was not retired. And, the court found it significant, somehow, that he had not spoken with her, had not had verbal interaction with her, after May. You've reserved three minutes for rebuttal. I'm sorry, Your Honor. Thank you. We'll hear from Mr. Horahan. May I ask one . . . Sure. Just again, a factual question or a documentation question. There's some issue with respect to . . . This is on the . . . whether the state statute of limitations is told, because she complained to the EEOC. And, there was a suggestion in your brief, that your client had specifically filed something with the State Division of Human Rights. And, that something is Exhibit 11 to the plaintiff's deposition. But, that is not in the record on appeals, not in the appendix. And, apparently, that exhibit, as far as we could find, was not filed in either a summary judgment motion or in opposition to it. Is that something that we can have? Surely, Your Honor. And, it's contained in the record at A311, although that's not marked as a deposition exhibit. That is the initiating complaint from her attorney at the time. Oh, oh. That's what I was wondering about. So, you agree that the thing that is Exhibit 11 in the deposition is the form that was filed with the EEOC . . . That is . . . . . . that also says on top, the State Division of Human Rights. Right? And, it has language at the bottom saying, I request that it be filed with the Division of Human Rights. That's the thing that is referred to in the plaintiff's deposition as Exhibit 11. It's my recollection that it was either that or the letter by her attorney at page 311, where he alleges continuing violations . . . Well, yes, but . . . . . . that it's brought . . . Excuse me, Ms. Bosman. Yes. It may well be that the, as a matter of law, the exhibit that is filed . . . the complaint that was filed or the letter that was filed with the EEOC . . . constitutes as a matter of law, a filing with the State Division of Human Rights with whatever consequences do or don't follow from that. I'm not trying to make any legal point or ask any legal question. I'm just trying to find out whether factually, there is a contention by you that in addition to whatever legal argument you have . . . that the EEOC document constitutes a filing with the Division of Human Rights . . . that there was also some separate . . . Are you arguing there was also evidence of some separate document that was filed specifically with the Department of Human Rights of the State . . . and not with the EEOC? No. Okay. Thank you. Okay. Very good. Mr. Horahan. Good morning. May it please the Court, Counsel. My name is Jeremy Horahan. I represent almost all the defendants in the case, other than Defendant Yost, who is represented by Attorney Wolford. The indication, I think we all understand the facts are a little, maybe as clear as mud here, for lack of a better term. But, the one thing that I think we can all agree on is that the circumstances in the Village of Painted Post changed as of January 1, 2007. That was the time that Chief Helm took over as the Chief of Police. December 31, 2006 was the time that Defendant Yost retired as the Chief of Police in the Village of Painted Post. It's my client's position that one of the first evaluations by this Court is to determine that that line of demarcation, the 31st to the 1st, would be the end of Phase 1 in December 31, 2006 and the beginning of Phase 2, January 1, 2007. I'd like to focus your attention on Phase 2 and how the Village responded to complaints that pornography was visible either as actual images or as auto-fill-in mentions that tended to demonstrate that the Department's computers were used for viewing pornography. In particular, I'd like you to address the adequacy or inadequacy of the two memos that Chief Helm sent, one in 2007, one in 2008, neither of which really mentions pornography at all. It just says, gee, I just remind you about the computer usage policy. Could you address that? Because that seems to me a very weak response to a complaint that pornography was being viewed in the Police Department. Yes, Your Honor. So the way the record indicates is that there was a complaint of viewing web addresses in the history of a computer in early 2007, February, I think, of 2007. At that time, that was one of the first memos that Chief Helm issued to the Department. And you're correct, the memo itself does not address that pornography web addresses were found in the history, or obviously, or I shouldn't say obviously, that they were likely being viewed if they were in there. But it did address that the computer is only to be used for work purposes and not for any other purposes, personal or anything else along that line. At this point, the plaintiff's testimony differs slightly than the memo that she issued to the Chief in late 2008. In her testimony, she says, oh, I continue to see it, with no other specifics other than I continue to see it. She said many times. Many times, yeah. The memo she wrote indicates that at that time that memo was issued, it ceased for about a year. And then there was another complaint about a year later, I think it was actually closer to May 2008. In May 2008, again made a complaint, and another memo was issued by Chief Helm at that time. Which also didn't mention pornography. Once again, I did not directly allege that anyone had looked at pornography. But this time, he locked the computers out by password. Meaning that officers could only access the computers or the Internet on the computers if they received a password from the Chief. Meaning they had to give them a basis for that. I don't really understand what, I mean, so that made people more accountable if they were caught? Was that the notion? I think the idea behind it and the way the Chief testified was, I think giving a password would help with a time frame of use. But more, it would make them less apt to use the computer unless they actually had work to do on the computer. They wouldn't be able to just use it in their free time. Is that, in your view, in the department's view or the village's view, an adequate response to the complaints of people watching pornography at the police department at work? And again, the allegation was that it was found in the web address, or in the history the web addresses were found. I believe that limiting the access to the computers would then limit the potential use for uses other than work uses. I'm not sure I understand how it limits the use. So there's a password, and you have to ask the Chief for the password. Then you know the password. He changed the password, period. Is that in the… I believe his testimony indicated that. I can find it in the record. And I guess the other thing that's puzzling is this goes back to the question of what is on the computer. If the search history isn't purged, then the search history is there no matter what, right? Yeah, and there's nothing in the record to indicate what happened to the search history after these memos were issued, Your Honor. Well, I'm just – so if all that's seen is search history, I guess it's a possibly disputed fact issue as to whether that means that pornography continued to be viewed after Yo's departure. But Ms. Bozeman argued that a reasonable fact finder could conclude that the password business actually shut her out so that she couldn't check up on what was going on more than it shut anybody else out, and that a jury could find that that was the reason for this rather than some effort to deal with the problem. The plaintiff's deposition testimony is clear that when she asked for a password, she was given a password. So she wasn't limited any more than anyone else to use the computers. In fact, she was given just as much right as everyone else. And may I ask – I mean, I appreciate that the departure of Yoast is of some significance. On the other hand, if there are episodes, as Ms. Bozeman argued here, of unfair, disparate reprimands, of not being told when the bulletproof vest fitting was going to be, of a pay reduction that I understand you have a response to but that may or may not create an issue of fact, if various discriminatory actions continue after Yoast's departure, maybe ones that are less severe, but why – you know, if you have five harassers in a department, I don't mean your department but any company, and the worst one leaves but a pattern continues even if at a lower level, why isn't that all part of the same hostile environment? In the Fitzgerald case, the one that this Court decided to divide into phases, that included one defendant and one individual who was discriminated against the plaintiff in that case. And the ruling there when the phases were divided was phase one, the defendant's actions in that case were very sexually derogatory and types of that nature, and the phase two actions were different. So even though it was the same defendant, we could see that they were different. Here, the actions by the allegations against Yoast in phase one are far different than the allegations against the remaining defendants. They're more extreme. There's physical abuse, which is pretty unusual in these cases, you know, of a non or partially sexual nature, but it's – he chokes her and stuff like that. So of course that's worse, but there's also a continuing pattern, I think the plaintiff would say, of the – a drumbeat of these other things with the pornographic references with differential treatment of various kinds. Why, you know, understanding that the Yoast allegations are special, why – I'm having trouble saying why we should have just a complete break, or at least why that isn't a jury question. Whether, you know, the other stuff is trivial or didn't really happen, and the bad stuff you can blame on Yoast and he was gone. That's a trial issue, isn't it? Well, I understand where you're coming from, Your Honor. What's missing in the plaintiff's allegations and in the record as a whole is that those issues in phase two or the allegations in phase two, like the bulletproof vest and things like that, there's no proof that the conduct occurred because of her sex. When you look at them, they seem like situations that were minor and infrequent and there's so much time in between them that it's hard – it's almost impossible to tie them back. It's impossible to tie back failure to be present when she was fitted – when everyone else was fitted for a bulletproof vest, although she was given the information to be fitted for it. That didn't occur in phase one, and something similar to it must have occurred in phase one. I think the actions are starkly different and not related to her sex in phase two. What are the critical dates for statutes of limitations? The 300-day look-back, I believe the district court found was October 16, 2007 was the 300-day look-back at that point. I think that's proper. There's a little question with the EEOC. November 14th. There's an issue with the EEOC filing. The first one was not served on the village and the defendants, so then a second one was done. There was a little question – maybe I've read the district court ruling wrong. I argued in my papers that it should be November, but they decided it was October. I would understand that as well. I think the plaintiff's brief actually uses the November date, but at the same time, it did not seem to me that of all the murk about these dates and when different things happened, whatever that murk is, I didn't see anything that suggested that something happened between the October and the November date that would make it make a difference which date we used. I agree, Your Honor. There's nothing in the record to indicate anything happened in that month timeframe specifically that wouldn't make that murk. And there's a three-year statute of limitations for human rights law. Correct. What's the critical date there? The filing of the complaint, of course, I don't have it in front of me. It's May 21, 2012. Okay. May 21, 2009, absent tolling. Correct. Yes. And the argument that there's no tolling is that there was a filing under the EEOC which does not prevent a filing of a lawsuit in the state court. That's the plaintiff's argument, and I know my colleague has a lot more to argue about in that regard, specifically with his clients. But they filed with the EEOC, but there is an issue with the human rights filing and whether or not that was tolled. Yes. Your colleague is going to pick that up. What's that? He's going to take . . . I have faith in him that he will, yes. Why don't we hear then from . . . Thank you, Your Honor. Judge Hellerstein, is that all right with you? We'll ask to hear from the studio's counsel. Yes. All right. We could always have Mr. Horan stand up again. May it please the Court. James Wolford here on behalf of Defendant Appellee Donald Yost. In picking up where you had left off, our argument is very simple, is that under the work-sharing agreement 42 U.S.C. 2000E, the Division of Human Rights was notified about the filing with the EEOC. However, that does not constitute . . . The Human Rights Division defers to the EEOC. Correct. And filing with the EEOC does not toll the right to sue in the state court? Correct. So there was always the right to file in the state court? Absolutely. And that means there's no tolling? Correct. So what is the critical date in the state court? The critical date, as you had talked . . . It's three years . . . May 21, 2009. All right. Now there's allegations that things happened after, what, October 16, 2007? Or after May 20, 2009? Which is it? I believe it's the October date of 2007. So that's the date we have to focus on? That is my understanding, yes. What allegedly happened after that against your client? Absolutely nothing. My client retired from the Village of Painted Post . . . But he came back as a consultant, and Ms. Bosman said he stalked her client. Well, he . . . What's the allegation? Forget about the Barretts. What's the allegation? The allegation is my understanding is he would show up at a park where she was, had no verbal contact with her whatsoever. Mind you, Village of Painted Post is a small village. After October 16, 2007? Yes, I believe that's my understanding as far as the allegations are concerned, yes. As far as the allegation is, the notion is that he, like, walks his dog in the park where the park is supposed to be closed, knowing that Officer Kimball was going to be on patrol at that time and would see him there, and would then have to decide whether to issue him a summons or not or do something. And then there's something that goes on where Chief Palm eventually says, I'm not going to take any more reports about Mr. Yost. Is that . . . Yes, that's my understanding. Mind you, the plaintiff is armed. My client is not armed. As I was saying, Village of Painted Post is a very small village, so coming into contact with Mr. Yost, who's a lifelong resident there, certainly is not uncommon. The allegation is that the dog walking of Yost constituted stalking of the plaintiff? That's their allegations. I'm not trying to . . . Weren't there allegations . . . But that's the allegation. Yes, that's the allegation. Weren't there allegations also that he would sit in his car with a camera and focus on her house? Once again, yes, those are the allegations, but there's absolutely no proof that that occurred. Didn't a neighbor complain about that? Wasn't there testimony to that effect? Not that I recall, no, Your Honor. Thank you. Let's assume for the moment that there is evidence of this kind of stalking-like behavior after Mr. Yost is no longer employed by or performing functions for the village. How would that factor into this hostile environment complaint? My argument would be that it would not factor at all into the hostile working environment. Mr. Yost was hired as a consultant. However, there's unequivocal testimony from the chief home that they never consulted Yost. But he had a three-year-long obligation, didn't he, after he took the buyout? Yes, as a consultant. He had an ongoing relationship with the department. They were paying him, and they were entitled to call on him during the full three-year period. Isn't that right? That is correct. However, he was never called on. So he, in essence, was never part of the Village of Painted Posts Department. He was never, I think, chief. He had been there for 30 years before? Correct. As chief? Yes. Well, I think it was actually 27 years. And they had the three years so that he would hit the 30-year mark. Why would it follow that it can't be part, either that it can't be attributed to the village, I suppose that's your colleague's issue, or that to the extent that he is sued under the New York law as an individual participant in this harassment, that if he, while employed, even if only as a consultant, even if they don't ask him anything, why isn't his behavior still, as directed to a member of the department, potentially actionable as part of what an employee of the department or somebody who works for the department, is being paid by the department, is doing to her? Why does it just not count? Why is he just totally a civilian while he's on the payroll of the police department? Well, and like you said, I represent Defendant Yost. I understand. So I don't want to speak for him. It's his problem as to whether anything that Yost did is attributable to the village. Right. But I'm still wondering about is it attributable to him as part of this pattern if he has a continued employment relationship with the village? It's not like he's a stranger now whose acts of harassment may be tortious or criminal or something but have nothing to do with her employment. They're still both part of the department in a sense, right? Yeah. I don't disagree with that rationale. However, we need to look at the complaint and what the allegations were against Yost, and that was as an aider and a better, which our argument is very clear. You can't aid and abet your own conduct. So I would fall back that, yes, in theory that argument may make sense. However, according to the complaint, it's not there. So you're saying the separate – and help me out – with respect to the separate theory that he is liable as a supervisor, is the issue just that that's not pled or is it also that he's no longer, whatever else he is, he's no longer her supervisor during the secondary period? I would say both, yes. All right. What are the issues of fact in your mind? You would say there are none that Judge Sirigusa found that there were no issues of fact relating to Yost. So is it one issue that as a consultant, formerly the chief, he had some kind of a supervisory relationship over the plaintiff or some influence with the department over the plaintiff? Apparently that is what they would say. Is that the issue of fact? But I would disagree that that would be an issue of fact with respect to my client and his conduct. If just as another person who from time to time was employed by the police department, he committed the acts of which plaintiff alleges and complains, is that an employment discrimination? I would argue no under these circumstances. Or even aiding and abetting an employment discrimination? Well, how it is alleged here in the complaint is that my client essentially aided and abetted his own conduct, which I would say is improper. Well, the conduct of the police department in not doing anything in relationship to the complaints made against your client. Which are time barred. Except the fact that he walked his dog in the park and photographed the house. Right. I mean, according to those allegations given. Those would be the issues of fact. Yeah. Or not. Right. I would say that those certainly don't rise to the level of any type of discrimination or retaliation. Thank you very much. Thank you. May I ask, Mr. Horan, what in your mind are the issues of fact relating to the department? Could you specify a little more for me, Judge? Well, I'm trying to understand it. Your argument is there are no issues. That's my response, yeah. What are the things that you understand? Because I have a little trouble sometimes following it. What are the things that you understand are being alleged that you contend don't rise to the level of issues of fact? Does that help? Sure. Yeah, it does. And really, I think the 300-day look-back period is key to that. It's key both for the Title VII issues but also for the hostile work environment issues. So I think there are maybe four things that allegedly occurred during that 300-day look-back period. One is the reduction in longevity pay. That, in my argument, it's not material. When you do the math, it's a couple hundred dollars maybe, plus there's a legitimate business decision for it. They missed a four-year lapse and it was reduced for that time. The second one was discipline differently in the mail officers. There was one counseling memorandum within the 300-day look-back period. It was for a one-car accident at the plaintiff who was in. It was simply a counseling memorandum, no other discipline, no doc days, nothing else. Again, not a material term and condition of employment. Third, the pornographic addresses. I think we've addressed that at length, but, again, I think that's immaterial. Within the 300-day period, I believe there was only the one allegation, and it was around the time that she wrote the memorandum. And a second memorandum was issued by Chief Helm at that time. Again, would argue there's no material change in the employee's terms of employment. And the last one is this allegation about overtime pay. And it's really a broad allegation that she felt she didn't get as much as normal. There's no real time frame other than there was an event in the village called Colonial Days that Chief Helm testified was a first-come, first-serve, outside employment. They could work overtime for it, and she alleges she did not receive any for that. She did say that her overall overtime pay was reduced by approximately half. She approximated that, Your Honor. So not just Colonial Days, but just overall, that other people, the implicit was other people are getting a lot of overtime, and that's affecting their pay, and I'm not. Yeah, and I don't think that's implicit, necessarily, Judge. There may not have been overtime available. And that's something that's not shown in the record, and she needs to show that other people received it over her. But the plaintiff is not able to show that here, nor is she able to specifically show that she lost out on that income. I mean, she's alleged, oh, I think I missed half, but we don't have anything in the record to make that material to know if it's even true. And so those are the things, and I, again, argue there's no question of fact there. Thank you. Thank you very much. Okay, Ms. Bosman, you have three minutes for rebuttal, please. Yes, Your Honor. Your Honor, I'd like to draw the court's attention to Griffin v. Serva, Incorporated, this court's decision in May of this year, indicating that the aid, or in a better section, 296 paren 6 is to be construed broadly, and the New York Court of Appeals confirmed that on a certified question. To speak to the issues of fact, Mr. Horan mentioned it. Are those the four that you're relying on, or are there others? There are others, Your Honor. And I believe we set them forth in our reply brief and in our principal brief. But I'd like to draw your attention. Within the 300-day period, are there anything other than the four he mentioned? Within the 300 days? Yes. Her pay was, her tier was reduced. She was denied overtime. If you take a look at page A310 of the record, it's a letter from Mr. Militello, her attorney at the time. It was right before her pay was reduced. They suddenly found that out. Excuse me. Her attorney, or the union's attorney, wrote to her and said, they're absolutely right. They should have, they were correct in reducing your, really it's based on longevity in the department, because they mistakenly credited you with an earlier time period that you had worked for the department years before, and there was a break in service. And the attorney for the union says that's correct. Do you, is there any evidence that would dispute that this was a correct adjustment in her pay? I believe that that presents a question of fact, and if you take a look. What presents a question of fact? What is the evidence that her own attorney was wrong about that? The evidence is in the record at A14 through A, I believe it's 420, which sets forth the pay rates. And you compare that to the contract, and you look at the tier hearing. Now, she was in that tier for many years before June of 2008. And that discriminatory response to Mr. Mil- You know, there was this whole investigation that was provoked by her complaint that she was paid differentially, the investigation that leads to the release. That was like a difference of 13 cents an hour that she complained about? In the course of that, apparently, it was discovered that she was, whatever the validity of those allegations, she was being credited with continuous service that she, in fact, did not have. And the question is, what is the evidence in the . . . Who testifies that this was, in fact, wrong, that they reduced her longevity pay? Where do we look for that? I believe that that is in her contract. We have to examine the contract and make our own determination. Well, it's a question of fact, Judge. Excuse me. Why is it a question of fact whether she had the continuous service that's required to put her in that tier? And why is it that it's on us now to examine the contract, examine all the data, when no one on your side of the table seems to have done that and presented us with an explanation of why it is that this calculation was inaccurate? I believe if you look at her pay record through the retirement system, and I think she testified about that, that they were only crediting her for 20 hours a week, even though she was earning over 40 hours a week. So that tier reduction was based upon a look back and saying, well, she was only part-time, so then she's not entitled to that benefit, and then they reduced it. I believe that it happens coincidentally with her complaint by . . . And where in your brief is there an explanation of that, or where in her testimony, or anybody else's testimony is there something that gives us a guide, or are we left to examine all the pay records for ourself and draw our own conclusions? I believe that she testified about that in her deposition, but I'll be happy to summarize it for the Court. Thank you very much.  Thank you, Your Honor. Thank you. We will reserve the position.